IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
SYRACUSE DIVISION

| | |
|---|---|
| KEVIN BRANEY, John Does 1-1,000 on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Case No.   5:19-cv-210 (TJM/TWD) |
| v. | JURY DEMANDED |
| ROMAN CATHOLIC DIOCESE OF SYRACUSE, THE UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, BISHOP ROBERT J. CUNNINGHAM, ESTATE OF CHARLES ECKERMANN, PAUL ANGELICCHIO, ESTATE OF JAMES QUINN, JACQUELINE BRESSETTE, and JOHN DOE PRIESTS 4-200, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Comes now Plaintiff Kevin Braney, by counsel, for himself and as Class Representative for the thousands of other people who were tortured and raped as children by the priests of the Roman Catholic Diocese of Syracuse, and makes his Complaint for Damages and Class relief as follows:

## I.      INTRODUCTION

This Complaint arises from the severe and long-term pattern of organized sexual abuse of an unknown number of adolescent children by their priests. Using religion as both a source of power and a pretext for their sins, these priests preyed on young boys and girls in ways that are

difficult to even fathom. This story is told through the rape and torture of one young man, Kevin Braney ["Kevin"]. Sadly, Kevin is far from alone. The priests that raped Kevin, Defendants Eckermann, Angelicchio, and Quinn, were part of a larger network of priests who raped children and were sheltered and protected by the Roman Catholic Diocese of Syracuse from at least the 1940s, if not earlier, until the present day. The Diocese collected and literally sheltered known child rapist priests in Syracuse in a coordinated scheme to protect the Church from liability and defraud parishioners who donated countless amounts of money that was then used to pay for the legal defense of rapist priests. This class action involves the sexual abuse, exploitation, and perpetual rape of hundreds of innocent children by defendants, clergyman, and religious entities entrusted to protect them.  The gruesome and shocking allegations made in this Complaint do not even begin to portray the prolonged, sadistic, and horrifying abuse of so many young children within the Diocese of Syracuse. The bad actor priests could never have evaded detection were they not harbored, protected, and facilitated by the Church, which shuffled them around and committed numerous acts of fraud and obstruction of justice to make sure that money and power flowed into the Church and the child victims were left to suffer alone.

## II.    JURISDICTION AND VENUE

1.    This is a civil action seeking relief and damages under New York contract and tort law. Federal jurisdiction is proper under the Class Action Fairness Act, 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000, diversity of citizenship exists between the representative plaintiff and the defendants, and the proposed classes comprise more than one hundred members.

2.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391.

### III.    PARTIES

3.      Plaintiff Kevin Braney is a natural person, a United States citizen, and a resident of Colorado. He may be served through his attorneys, whose contact information appears at the end of this Complaint.

**Institutional Defendants**

4.      Defendant The Roman Catholic Diocese of Syracuse ["the Diocese"] is a New York religious corporation with a business address of 240 East Onondaga Street, Syracuse, NY 13202.

5.      Defendant The United States Conference of Catholic Bishops ["the USCCB"] is a domestic nonprofit corporation that may be served through its Registered Agent, Ronny Edward Jenkins, at 3211 Fourth Street NE, Washington D.C. 20017.

**Individual Defendants**

6.      Defendant Jacqueline Bressette is a natural person, a United States citizen, and a resident of New York. She may be served through her business address as the Diocese Assistance Coordinator for the Roman Catholic Diocese of Syracuse, 240 East Onondaga Street, Syracuse, NY 13202.

7.      Defendant Bishop Robert J. Cunningham is a natural person, a United States citizen, and a resident of New York. He may be served through his business address with the Roman Catholic Diocese of Syracuse, 240 East Onondaga Street, Syracuse, NY 13202.

8.      Defendant Father Paul Angelicchio is currently a priest in good standing with the Diocese of Syracuse. He can be served through his employer, the Diocese of Syracuse, at 240 East Onondaga Street, Syracuse, NY 13202.

9.      Defendants Estate of Charles Eckermann and Estate of James Quinn can be served via alias summons, as the Estates' representatives are not currently known.

10.     Defendants John Doe Priests 4-200 are priests who committed sexual abuse of class members, but whose identity are yet unknown.

### IV.    FACTS

### Background Regarding Kevin Braney

11.     Kevin was born on ███████ 1972 in Atlanta, Georgia.

12.     In 1978, when Kevin was 6 years old, Kevin's family joined the St. Ann's Catholic Parish in Manlius, New York ["St. Ann's] immediately upon moving to Syracuse.

13.     By 1988 Monsignor Charles Eckermann ["Eckermann"] and Reverend Paul Angelicchio ["Angelicchio"] were the acting clergymen at St. Ann's.

14.     In 1984, the Syracuse Police Department had directly reported to the Diocese that Eckermann was soliciting male prostitutes, despite his alleged vow of chastity.

15.     Sometime between 1984 and 1988, a family reported to the Diocese that two of their sons had been sexually abused by Eckermann, while acting as altar boys at St John the Baptist parish in Syracuse.

16.     By 1988, the Diocese was aware that Eckermann anally and orally raped children.[1]

17.     By 1988, the Diocese was aware that Quinn anally and orally raped children.

---

[1] Eckermann was a known sexual deviant who should not have been allowed to work with children. *See* John O'Brien, *Syracuse police raised concerns about priest 30 years before child-molesting accusations surfaced,* (December 11, 2014) http://www.syracuse.com/news/index.ssf/2014/12/thirty_years_before_child-molesting_accusations_against_priest_syracuse_police_r.html.

18.     By 1988, it was well known to the Diocese that Angelicchio had raped numerous children at local Catholic Schools.

19.     The children raped by Angelicchio had complained to nuns at their school and those claims specifically were brought to the attention of the Diocese.

20.     In the summer of 1988, Kevin was 15 years old.

21.     He had just finished his freshman year of high school and had never even kissed a girl – he had a bright outlook and a promising life ahead.

22.     As an altar boy at St. Ann's in Manlius, Kevin took the duties and responsibilities seriously, and was looking forward to serving at the wedding of Kristen and Brian – she was a swimming instructor and he was a family friend.

23.     But instead of being a day filled with joy, the day of the wedding was the beginning of a tortured and dark journey.

24.     Kevin was in the sacristy preparing for the wedding ceremony. He had donned his cassock and tied the rope around his waist when Angelicchio approached him with the façade of "adjusting" Kevin's rope, but his hands quickly moved over Kevin's clothes to his penis.

25.     Kevin was frozen in terror as Father Paul Angelicchio violated him.

26.     Eckermann watched as his young protégé, Angelicchio, violated Kevin.

27.     When Angelicchio had finished touching Kevin, Eckermann took his turn, demonstrating his sadistic proclivities by aggressively squeezing Kevin's testicles to induce pain.

28.     Throughout the ordeal, neither Angelicchio nor Eckermann looked at Kevin. They only looked at each other. It all ended as suddenly as it began. These men, and the child they had just broken, all left to perform the sacrament and continue business as usual during the wedding ceremony.

29.     As the months passed, the priests became increasingly emboldened and the abuse of Kevin escalated to oral and anal rape.

30.     The first anal rape Kevin can clearly remember happened during Advent in 1988. Eckermann was wearing red for the occasion. Eckermann was in the small bathroom by the main entrance of St. Ann's with Kevin, while Angelicchio stood guard by the door as parishioners walked past. The tiles in the bathroom were light blue and there was a small stained-glass window to the right of the toilet. Eckermann told Kevin what he needed (to have anal sex), but Kevin told him that he did not want to. That is when Eckermann grabbed the nearby toilet plunger with the wooden handle and threatened to rape Kevin while he placed the plunger against his anus, forcing Kevin to submit. Eckermann raped Kevin while Angelicchio stood guard.

31.     When Kevin left the bathroom visibly distraught Angelicchio told parishioners not to worry that Kevin was just "not feeling well."

32.     By the beginning of 1989, Kevin gave up all hope that anyone would stop Eckermann and Angelicchio. Even though his penis was raw and swollen from their rough masturbation of it and he had blood in his underwear from the rapes, these physical manifestations of the abuse were not enough for action by the Diocese which was tasked with protecting Kevin.

33.     Kevin gave up hope that the Diocese and the catholic church or the "God" that Eckermann and Angelicchio allegedly represented would save him from the torture he was enduring.

34.    Eckermann and Angelicchio had tortured Kevin's mind, body, and soul to the point that he believed that the relentless abuse and rapes were part of his job as an altar boy, on the same level as retrieving wine, ringing the bell, or holding up the Bible during the Gospel.

35.    The rapes continued to take place throughout various locations at St. Ann's. Eckermann was so bold as to have a camping mattress set up in the furnace room in the basement, and no one questioned it. There, Eckermann would instruct Kevin to lie down on his stomach, and he raped Kevin in that position. At first, the pain was so excruciating it made Kevin want to vomit, but it happened so many times that Kevin could eventually block it out.

36.    Eckermann was in his 50s and raping Kevin on the camp mattress was hard on his knees, so he moved his abuse into the adjacent storage room, where there was a weight bench that he could make Kevin lie down on instead. There, he and Angelicchio held Kevin down so hard that he still bears the scars on his hands from their fingernails.

37.    Once, in February of 1989, right before the 10:30 am mass, Kevin asked Angelicchio to make it stop. In response, Angelicchio hit him hard and told Kevin that if he ever spoke about it again, they would kill him.

38.    The rapes in the storage room were even worse than anything else Kevin had been put through before. In this room, Eckermann kept a small banker's box. Inside the box were two guns – one black/graphite revolver and a smaller silver pistol with an ivory handle – guns that are permanently seared into Kevin's memory.  They were used to threaten Kevin into secrecy and submission.

39.    By this time, the abuse was morphing into ritualistic sadism: the Easter cross was kept in the torture room, and Eckermann and Angelicchio made Kevin stand next to it while Angelicchio fellated him and documented the abuse with polaroid pictures.

40.    It was as if Angelicchio was showing Kevin what to do, because then Eckermann would stand by the cross and make Kevin fellate him.

41.    The priests were so confident that their actions would have no repercussions that they repeatedly memorialized the abuse in photographs.

42.    These photographs, possibly thousands of them, were placed into a "picture Bible" of child rape scenes collected and kept by Priests in the Diocese.

43.    On another occasion Eckermann and Angelicchio threatened to put Kevin's testicles in a metal vice in the room adjacent next to the torture room.

44.    Eckermann repeatedly instructed Kevin that he was God and it was Kevin's job to please him and that if he refused or denied Eckermann or Angelicchio pleasure he would be sent to hell.

45.    This pattern of abuse continued throughout Kevin's sophomore year in high school until his confirmation.

46.    As Kevin prepared for confirmation, Eckermann used this religious sacrament to gain greater, unfettered access to the teenager.  On a trip to Christ the King Retreat House, owned by the Diocese, Eckermann raped Kevin in a bathroom.

47.    On a different trip to Alverna Heights he again raped Kevin in a bathroom. There was nowhere that Kevin was safe.

48.    Eckermann raped Kevin in an empty bedroom in the rectory adjacent to St. Ann's. Kevin has very vivid memories of this room. It was at the end of a hall on the left-hand side. When he walked in, the bed, which had a lace bedspread and a yellow bed skirt, was to the left, with nightstands on either side. On the nightstand nearest the door, there was a digital clock with red numbers. Eckermann put his glasses on the table beside the clock during the rapes. Opposite

the bed was a dresser, and in the area past the bed and dresser, near the window, was a standing lamp and a rocking chair. These seemingly discrete details will forever haunt Kevin. The window faced the street, and on the other side of the street, there was a park with a gazebo. Every time he was raped in that room, Kevin went to that gazebo in his mind. He would make sure to lie on the bed at an angle facing the window. He would leave the ugliness and hurt of what was happening to him and focus on the leaves blowing in the breeze.

49.    On September 30, 1989, there was a special confirmation class at St. Ann's for confirmands, including Kevin, who were on the soccer team and unable to attend the regular class.

50.    As they sat in the sanctuary, a priest Kevin had never seen before walked in. He was introduced as Father Quinn, and unbeknownst to Kevin at the time, he was Eckermann's best friend.[2]

51.    At the end of the class, Quinn told Kevin that he needed help carrying the programs from the spare room in the rectory to the church. Once they got to the room, Quinn pushed Kevin onto the floor and choked him while he held him down by pushing his knee into the right side of Kevin's back. He hissed into his ear, "You know what I'm going to do, so let's do it." "It" was over in about two minutes. Eckermann walked into the room and found Quinn with Kevin.

52.    The next day, Kevin was confirmed, and his family left St. Ann's.[3]

53.    Quinn was a priest in good standing in the Syracuse Diocese until he died in 2013.

---

[2] Father Quinn raped several young boys in Utica and Syracuse. Father Quinn had several victims known to the Institutional Defendants – at least one of whom committed suicide.

[3] Kevin had been asking his parents to leave St. Ann's since the abuse began, but his mother did not want to interfere with Kevin's progression towards confirmation.

54.     Kevin graduated from Fayetteville – Manlius High School and put the memories of the torture he had endured at St. Ann's out of his mind.

55.     Kevin was an All-American lacrosse player at Brown University.

56.     Kevin secured a Ph.D. from the University of Colorado.

57.     Kevin became a teacher and eventually the principal of Boulder High School in Boulder, Colorado.

## The Diocese Warehoused Known Child Molester Priests in Syracuse

58.     By the mid-1990s, it was widely known that hundreds of Roman Catholic priests had been raping children across the world.

59.     By 2002, the Boston Globe published its now famous exposé outlining rampant sexual abuse in the Catholic Church ["the Church"] and highlighting the Church's failures in addressing the abuse and taking measures against predator priests.[4]

60.     In 2002, the Diocese received a direct report that Charles Eckermann had raped him when he was a child, yet the Diocese took no action against Eckermann and allowed him to continue to be a priest for more than a decade.

61.     Despite the passage of 40 years since the first reported instances of abuse by Catholic priests, the culture of indifference remains today, and the Church and Diocese have failed to take actions to remediate the pain and suffering of thousands of innocent children

62.     As of January 28, 2019, there are 5,122 US predator priests named on Bishop Accountability, a database documenting the abuse in the Church.[5]

---

[4] Michael Rezendes, *Church allowed abuse by priest for years*, The Boston Globe (January 6, 2002)    https://www.bostonglobe.com/news/special-reports/2002/01/06/church-allowed-abuse-priest-for-years/cSHfGkTIrAT25qKGvBuDNM/story.html
[5] http://www.bishop-accountability.org/ (last visited February 1, 2019)

63.    Instead of taking accountability for these clergy and reporting child molesting priests to law enforcement, the Church and Diocese took every action to ignore and deny all plausibility for the perpetual abuse.

64.    The Diocese was fearful of litigation and instead of taking punitive measures to stop abuse, moved priests from dioceses which oversaw large Catholic Universities and valuable real estate (like Montreal, Baltimore, Philadelphia, New York City, and Brooklyn) to dioceses where the Church did not possess such valuable assets. One of those dioceses was The Diocese of Syracuse.

65.    Molester priests were moved from other dioceses in New York to The Diocese of Syracuse.

66.    The Diocese had actual notice that molester priests were being moved from Brooklyn to Syracuse and the Diocese was a breeding ground for priests who raped children.

67.    In 2004, the Diocese was alerted by Sister Sally Butler, a nun in New York City, that "unassignables" (i.e. molester priests from Baltimore) were being transferred to Syracuse.

68.    Her warnings fell on deaf ears as the Diocese allowed these unassignable Franciscan child rapists to come to the Diocese.

69.    The Diocese again acted with absolute disregard for the children of the Diocese when they accepted these very priests.

70.    The Diocese accepted known child molesters from outside the dioceses despite absolute knowledge, not just internally from their brethren in other parts of North America, but in the forms of letters to the editors of newspapers in the towns of the Diocese.

71.    The callous disregard of Defendants did not end in the 1990s or 2004 but continues to this day.

72.    In 2015, the Diocese repeatedly denied that several molester priests were living at the "Tommy Coyne House" owned by the Diocese. However, a simple check of the Syracuse phone book revealed that at least 5 priests who had credible findings of child molestation were living in the Tommy Coyne House.

73.    Priests residing in the Tommy Coyne House were found in possession of child pornography and presented a real and credible threat of harm to innocent children.

74.    The Tommy Coyne House is now closed.

75.    Had the Diocese taken even the most perfunctory action against these predator priests, Kevin and countless other innocent children would have been protected from this morbid sexual abuse.

76.    Until the national news media shined a bright light on the epidemic of abuse within the Catholic Church, the Church did not exhibit even the slightest regard for the safety of the children of the Diocese; that callous indifference continues to the present day.

**It All Comes Back To Kevin: The Diocese Acts to Marginalize Kevin and Other Victims**

77.    In 2012, as the principal at Boulder High School, Kevin learned that one of the students under his care had likely been the victim of sexual abuse.

78.    As a result of the disclosure of rampant sexual abuse at Penn State University, multiple reports of sexual assaults by former Boulder High teachers became the subject of an investigation with Boulder Police. One staff member was terminated.

79.    After he acted to aid the student who had been abused, Kevin began to recover the memories of the abuse that he had suffered.

80.     The memories were so horrific and staggering that Kevin began to experience serious emotional stress. The traumatic memories overwhelmed Kevin to the point that he believed he could no longer go on.

81.     As Kevin continued to suffer, on February 1, 2013, Quinn died, lauded for his service to the Church and as an "eternal optimist who thoroughly enjoyed life."[6]

82.     On February 6, 2013, Kevin attempted suicide.

83.     A month after his suicide attempt, Kevin was arrested after an argument with his wife.

84.      Kevin was charged for destroying property, chiefly a lamp. Kevin informed the Boulder Police Department in Colorado of the rapes and tortures he endured as boy in Syracuse.

85.     Colorado law enforcement notified law enforcement in Syracuse of Kevin's allegations against Eckermann and Quinn.

86.     Naively, Kevin reached out to Defendant Jacqueline Bressette ["Bressette"], the Victim Assistance Coordinator for the Diocese.

87.     Unbeknownst to Kevin at the time he reported, Defendant Bishop Cunningham ["Cunningham"] stated under oath in a 2011 deposition that "the boy is culpable" for his abuse by his priests.[7] A second round of torture and humiliation was about to begin.

---

[6] *Obituary for Reverend James F. Quinn* (February 3, 2013) http://obits.syracuse.com/obituaries/ syracuse/obituary.aspx?n=james-f-quinn&pid= 162802265&fhid=4680 (last visited February 1, 2019)

[7] John O'Brien, *Child victims partly to blame in priest sex-abuse cases*, *Syracuse bishop testified*, The Post-Standard, https://www.syracuse.com/news/index.ssf/2015/09/victims_partly_to_blame_in_priest_sex-abuse_cases_syracuse_bishop_testified.html (last visited February 1, 2019)

88.     Kevin trusted Bressette, Cunningham and other agents of the Diocese to do the right thing and make efforts to mitigate the effects of the abuse.

89.     Kevin believed Bressette, Cunningham and other agents of the Diocese would take substantial efforts to help him and use the information he provided to prevent further children from falling victim to sexual abuse within the church.

90.     The Diocese subsequently investigated Kevin's claims.

91.     Following his initial contact with Bressette, Kevin began corresponding with her regarding obligations the church would assume for treatment relating to the trauma that resulted from his sexual abuse.

92.     On September 25, 2013, Bressette sent correspondence to Rosemary Wrzos, MEd, LPC ["Wrzos"], who was Kevin's therapist. In that correspondence, Bressette explained the following:

      a.   The Diocese had approved only six therapy sessions for Kevin, which would be reimbursed at a rate of $85.00 per hour;

      b.   For approval of any additional treatment, Wrzos would first need to submit to the Diocese a treatment request form and the specific needs for additional counseling; and

      c.   The Diocese would not pay for psychotropic medications.

93.     Wrzos subsequently requested additional treatment for Kevin.

94.     In correspondence dated November 6, 2013, Bressette informed Wrzos that Cunningham (the same bishop who imputed fault on innocent children victims of sexual abuse) had approved 26 additional sessions of psychotherapy for Kevin.

95.     Also on November 6, 2013, Bressette sent a letter to Kevin requesting that he sign a release of information for Wrzos.

96.     Prior to this letter, Kevin had never been told that he would be required to make his therapy records available to the Diocese of Syracuse.

97.     In its introductory paragraph, the Release that Kevin was required to sign states: "I, or my authorized representative, request that psychotherapy notes regarding my care and treatment be released as set forth on this form[.]"

98.     Section 7(a) of the Release states that the specific information to be released was: "Medical record including patient histories, office notes (except psychotherapy notes), referrals, consults, and billing records from 8.1.14 to *ongoing*."

99.     Section 7(b) of the Release authorizes the named provider "to discuss [Kevin's] health information with the Roman Catholic Diocese of Syracuse, its employees and/or agents."

100.    However, at all relevant times, Bressette represented to Kevin that the Church would not be accessing or viewing the clinical notes, all his psychotherapy records would remain confidential and Institutional Defendants simply needed them signed for reimbursement purposes

101.    In December 2013, Kevin signed the document, releasing his medical records, in his continued attempt to be agreeable with the demands of the Church and so that he may begin to receive some compensation for the costly mental health treatment he was undergoing as a result of the abuse.

102.    Kevin was under the reasonable assumption that by signing away the rights to his personal health information, the Diocese would uphold its end of the bargain by reimbursing Kevin for the costs associated with his treatment.

103.    On December 1, 2013, Wrzos sent Bressette an invoice for $5,562.00, which included charges for services Kevin had received prior to the six initial sessions authorized by the Diocese.

104.    On January 13, 2014, in response to the invoice Wrzos sent, Bressette, the person tasked with assisting victims of sexual abuse, sent Wrzos a check for $510.00, which amounts to 6 sessions at $85.00 per hour.

105.    The message was clear that the Diocese did not see or appreciate the need for Kevin to receive adequate counseling to help reconcile the abuse.

106.    In April 2014, the Diocese determined that Kevin's allegations of sexual abuse were credible.

107.    On Good Friday, April 18, 2014, after the Diocese found that Eckermann had abused Kevin, Eckermann was still permitted by the Diocese to attend mass.

108.    Kevin's parents attended the very same mass, face-to-face with the predator who had abused their son.

109.    When Kevin confronted Bressette with this fact, she told him that Eckermann could choose to attend mass wherever he wanted, and the Church would not take steps to prevent his attendance.

110.    The Diocese initially resisted taking steps to ensure Kevin and his parents' emotional and physical safety and would not take any steps to stop Eckermann from attending mass and intimidating Kevin's family.

111.    In a telephone call with Bressette on April 14, 2014, Kevin was again informed that treatment for his PTSD would be reimbursed at the rate of $85.00 per hour.

112.    Treatment for Kevin's PTSD would not be reimbursed if his care program was not consistent with the established guidelines invented by the Institutional Defendants.

113.    Kevin's PTSD treatment cost $130.00 per hour.

114.    The Diocese was aware of the difference between its reimbursement rate and the actual cost of treatment.

115.    Kevin's was forced to pay out-of-pocket and go into debt for the therapy costs beyond what the Diocese of Syracuse would pay.

116.    During the April 14, 2014 telephone call, Bressette informed Kevin that he was expected to pay the difference between the cost of treatment and the rate at which the Diocese of Syracuse would pay.

117.    Upon information and belief, other child rape victims and class members had to pay some or all of their counseling bills.

118.    During the April 14, 2014, telephone call, Bressette informed Kevin that he would not be reimbursed for any treatment he received prior to November 6, 2013. The arbitrary reasoning behind this denial is not known.

119.    Other class members applied for reimbursement for counseling, therapy and treatment were unilaterally denied without explanation.

120.    Bressette acknowledged the $5,562.00 in bills that Kevin had previously submitted and advised Kevin that the Diocese would not consider his bill for $5,562.00 for reimbursement.

121.    Bressette also advised Kevin that the Diocese would not consider his pending hospital bills for reimbursement.

122.    During the April 14, 2014 telephone call, Bressette informed Kevin that no other financial restitution or restorative actions would be forthcoming and that the Diocese considered his case to be closed.

123.    Kevin was traumatized by Bressette's dismissive treatment of him.

124.    Subsequent to his traumatizing phone call with Bressette, Kevin demanded to meet with Cunningham.

125.    On April 24, 2014, Bressette sent Wrzos a letter, which stated (in part):

I will assume you are aware that Kevin has utilized the allotted 26 visits approved for payment by the Roman Catholic Diocese of Syracuse. If Kevin is in need of additional visits, please completed (sic) the enclosed continuing outpatient treatment request form and return it to my attention . . . . Once the form is received, the Treatment Advisory Committee will review the request to confirm that further treatment is necessary and clinically appropriate, is related to the issue at hand, is productive, and is oriented toward an identified goal of wellness.

126.    In a letter dated May 15, 2014, Bressette advised Wrzos that Cunningham had approved thirty (30) additional 1-hour sessions for Kevin.

127.    Kevin was granted an attendance with Bishop Cunningham on June 2, 2014.

128.    Upon learning that Bressette would also be in attendance at the meeting, Kevin decided to bring his mother to the meeting for support.

129.    Kevin was forced to travel from Colorado to New York, at his own expense, to attempt to procure payment for future treatment for his PTSD.

130.    During the meeting, Kevin was again required to reveal the excoriating, sordid details of his abuse to Bishop Cunningham and Bressette.

131.    Two days later, on June 5, 2014, Defendant Bressette sent Kevin a letter, which included the following information:

a. Cunningham agreed to reimburse Kevin for amounts previously denied by Bressette; and

b. Wrzos would be reimbursed at her actual rate of $130.00 per session.

132. On July 8, 2014, Bressette sent Wrzos a check for $6,555.00; the cover letter accompanying the check stated in part: "[The amount of this check] includes the balance owed on Kevin's bill for $5,645.00 and the balance owed on the May 1, 2014 statement of $910.00. Going forward, the Diocese will pay your contracted fee with Kevin of $130 per counseling session (90837)."

133. On July 22, 2014, Bressette sent Kevin a letter, which stated in part:

Enclosed you will find a check totaling $13,259.39 which includes your out-of-pocket expenses for inpatient and outpatient mental health counseling from 9.19.12 to 5.29.14.

* * *

As stated in the letter to Rosemary Wrzos dated 7.9.14 and as we discussed, the Diocese will pay your contracted fee with Ms. Wrzos of $130 per counseling session (90837). Any incurred costs over and above the Diocese's payment of $130 per session will be between you and Ms. Wrzos.

134. On August 1, 2014, Bressette sent a letter to Peter Kleinman, MD, who was also one of Kevin's treatment providers, requesting documentation so that she could issue payment of $1,150.00 to him.

135. Kevin, like other class members, had to endure new abuse and manipulation at the hands of Bressette and the Diocese to simply receive reimbursement for the mental health treatment he so desperately needed.

136.    By August 2014, Kevin determined the church was receiving and reviewing his medical records in their entirety and was still continually denying reimbursement of his medical treatment.

137.    Kevin subsequently revoked the blanket release of his complete medical history.

138.    In response to his revocation, the Diocese stopped paying for Kevin's therapy altogether.

139.    Through its agent, Bressette, the Diocese arbitrarily and continually refused (for many months) to reimburse Kevin for treatment he had received to address the mental disorders he suffered as a result of his abuse by priests without the executed release and sent him additional versions to sign and complete. Instead, Kevin went further into debt to pay for his counseling.

140.    Kevin's frustrations with the "counseling program" offered by the Diocese were not unique.

141.    The counseling program offered to priest rape victims was never intended to help the children abused by the employees of the Institutional Defendants. Instead the program of counseling offered was designed to garner information to gage their collective potential liability. The counseling program was designed to frustrate victims into simply giving up.

142.    Kevin, like other class members, did not believe that the Diocese was still harboring, employing, and sheltering their rapists should have access to his therapy notes and records.

143.    None of the defendants made any efforts to bring healing or reconciliation to Kevin or his fellow class members.

144.    Kevin and his fellow class members were forced to face many thousands of dollars of medical expenses alone.

145.    Kevin and his fellow class members were re-victimized and retraumatized by the actions and/or inactions of all of the defendants.

146.    Throughout this entire time period, Institutional Defendants made materially false statements to law enforcement and to the media about their knowledge of molester priests in the Diocese.

147.    On at least one occasion, the Diocese and its agents actively interfered in a law enforcement investigation of a priest in procession of child pornography.[8]

148.    Kevin's credibility was publicly challenged by none other than the Onondaga County District Attorney's office based on false information provided to his office by the Diocese.[9]

**<u>Sham Investigation Of Claims By The Institutional Defendants</u>**

149.    At some point in October or November of 2016, the Diocese announced that Angelicchio was being placed on suspension so that allegations of sexual abuse against him could be investigated.

150.    In 2015, by agreement the Diocese agreed to report any allegations of sexual abuse to the District Attorney's offices of the Counties in the Diocese.[10]

---

[8] Doug Douty, *Plea Deal Possible For Catholic Priest Accused Of Having Child Porn,* The Syracuse Post Standard, (June 11, 2014)
https://www.syracuse.com/news/index.ssf/2014/06/plea_deal_possible_for_catholic_priest_in_syracuse_accused_of_having_child_porn.html

[9] William Fitzgerald, Esq, *Onondaga County DA: Priest's Accuser Not Credible,* The Syracuse Post Standard, (February 26, 2018)
https://www.syracuse.com/opinion/index.ssf/2018/02/onondaga_county_da_fitzpatrick_clergy_sex_abuse_kevin_braney_credibility_comment.html

151.    By the summer of 2016, the Church had received complaints from at least one man, not Kevin, that he had been raped by Angelicchio. These allegations pre-dated Angelicchio time at St. Ann's.

152.    The Diocese was aware that Angelicchio had raped numerous boys when they moved him to St. Ann's in 1988.

153.    On December 10, 2016, at 1 p.m. Mountain time in Denver, Colorado, an investigator hired by the Diocese interviewed Kevin about his allegations against Angelicchio.

154.    Only Kevin, his counsel, and the investigator for the Diocese were present.

155.    Literally while Kevin was being interviewed, the Syracuse District Attorney and the Diocese released media statements that the allegations of abuse against Angelicchio were not credible.

156.    Kevin's allegations had not even been disclosed to the Diocese by the time the Diocese and District Attorney Fitzpatrick released false statements to the media that the allegations against Angelicchio had been investigated and were found to not be credible.[11]

157.    Kevin was attacked by the District Attorney in a bizarre op-ed published in the Syracuse Post Standard[12]

---

[10] John O'Brien, *Syracuse Diocese Agrees To Tell About Child Molesting Accusations Against Priests*, (October 27, 2015)

[11] William Fitzgerald, Esq, *Onondaga County DA: Priest's Accuser Not Credible,* The Syracuse Post Standard, (February 26, 2018)
https://www.syracuse.com/opinion/index.ssf/2018/02/onondaga_county_da_fitzpatrick_clergy_sex_abuse_kevin_braney_credibility_comment.html

[12] *Id.*

158.    The false and maligning statements included in the District Attorney's op-ed were based on false information provided to the District Attorney's Office by the Diocese and Bishop Cunningham.

159.    Kevin's experiences being discredited by the District Attorney was not unique, but was representative of the approach taken by the Church in response to allegations of sexual abuse.

160.    The Diocese engaged in a decades-long enterprise to discredit, intimidate, bribe and otherwise harass Kevin and other class members who are victims of priest rape into silence.

161.    Kevin continues to represent the interests of the abused because he believes the church needs to take accountability and make major reforms to protect children; despite the humiliation and backlash he has experienced, Kevin continues his dedication to this cause.

### Diocese Misrepresents Source Of Funds For Priest Rape Settlement Program

162.     In February 2018, the Diocese announced that it would not be using donations of parishioners to fund the fallout from the untold number of child rapes committed by its priests.

163.    This was absolutely false.

164.    The Diocese continued to solicit donations telling parishioners that no money donated to the Church would be used for the purposes of paying victims.

165.    The Diocese admitted in a statement to parishioners the source of money used to pay victims in their 2018 settlement fund was in fact donations from parishioners.[13]

166.    Upon information and belief, the Diocese is self-insured because it is unable to purchase insurance on the open market because of the well-known history of priest sexual abuse.

---

[13] Patrick Lohmann, *Despite Syracuse diocese claim, parishioners will help pay sex abuse victims' settlements,* The Post Standard (March 12, 2018) https://www.syracuse.com/news/index.ssf/2018/03/post_1212.html

167.    The misrepresentations made by the Diocese regarding the use of tithing funds is another example of how the church abuses the trust and confidence of its parishioners, while hiding behind a cloak of secrecy, in its decades-long plight to conceal rampant sexual abuse.

**Negligence and Gross Negligence: the Diocese Ignores Sexual Abuse for Decades and Continue to Put Parishioners in Harm's Way**

168.    In the face of a clear duty to protect its parishioners, especially innocent children who act as altar servants, the Diocese has engaged in negligence and gross negligence by failing to protect or to investigate the sexual predators' abuse and exploit them.

169.    Despite having millions of dollars, the Church and the Institutional Defendants decided over the last two decades to not pay for reasonable compliance or security measures to ensure that priests were not sexually abusing young children even though they knew this abuse was occurring.

170.    The Diocese has had actual knowledge that sexual abuse is a major problem within the Church but have ignored all warnings and sought to silence those who have worked to stop sexual abuse by priests.

171.    Since at least 2002's Spotlight article, the Church has been under a microscope to investigate and initiate measures that seek to remediate the abuse.

172.    However, instead of seeking to help the parishioners and families who attended church within the Diocese, The Church continued to relocate predatory priests to Syracuse.

173.    The tales of sexual abuse of children are too numerous to adequately summarize, but they existed before the tenure of Cunningham and continue to proliferate today.

174.    Revelations about the handling of misconduct cases during Cunningham's tenure are continually being exposed.

175.    As this lawsuit reveals, the actions taken by the Defendants since sexual abuse by clergy was first reported amounts to nothing more than a sham to protect their own image.

176.    Decades have passed and the Defendants have continually failed to take adequate steps to remedy and/or stop abuse within the Syracuse Diocese.

177.    This 40-year delay is indefensible, and the Church and Diocese knew or were willfully blind that so many priests presented a clear and present danger to young male and female parishioners.

178.    To this day, the names of all abusers protected by the Church and Diocese have yet to be revealed.

179.    The Diocese has maintained its position that the victims are to blame, while the predatory clergyman are revered and heralded for doing "God's work."

180.    The Diocese had the power to ban and punish priests who committed sexual abuse, the financial resources to implement safeguards for innocent children, and the knowledge to make credible reports of misconduct to law enforcement. It simply chose to abandon the safety and security of these children. At the same time, it was burying its head in the sand so it could pretend not to be liable, while dioceses continue to declare bankruptcy to avoid the pecuniary recourse the law provides to victims.

### 2018 Settlement Program: A Last-Ditch Effort By The Church To Thwart Victims

181.    In 2018, the Church offered 85 rape victims of the Diocese's priests a chance to participate in mediation to resolve their claims.

182.    The Church offered identical programs in other dioceses across New York State.

183.    Like other dioceses in New York state, this program was called the Independent Reconciliation Compensation Program ["Settlement Program"].

184.    However, the Church did not properly fund the Syracuse version of the settlement program.

185.    The Syracuse Settlement program was vastly and intentionally underfunded.

186.    Unlike other settlement programs offered in the other New York Dioceses, the Syracuse Settlement program was limited to maximum offer of $300,000 per victim.

187.    Kevin was offered $300,000 from the settlement program.

188.    Kevin rejected the offer, as a showing that his silence could not be bought, and in order to further work to uncover the scheme by the Church and Institutional Defendants, which perpetuated the rapes of dozens of innocent children in the Syracuse Diocese.

189.    Instead of the money, Kevin sought an apology from the Church—an apology he still has not received.

190.    No compensation would be offered to child rape victims other than the 85 invited by the Diocese.

191.    The Diocese and Church knew that there were far more than 85 children that had been raped by their priests.

192.    In addition to lying to their parishioners about the source of funds for the settlement program, the Diocese did not participate in the settlement program in good faith.

193.    The Church and Diocese advertised the settlement program widely.

194.    The Church and Diocese used the settlement fund to gather information about potential claims other than those of the 85 rape victims invited to participate in the program.

### The USCCB's Response to the Sexual Abuse Crisis in the Church

195.    In the 1980s, 1990s, and early 2000s, decades of sexual abuse within the Church came to light.

196.    In Dallas, 2002, [Defendant] U.S. Conference of Catholic Bishops drafted a landmark document in response to the crisis of sexual abuse of children in the Church. This document, setting forth their agreed upon responsibilities in combating the problem, was entitled the *Charter for the Protection of Children and Young People*.[14]

197.    The *Charter* is a comprehensive set of procedures, established by the USCCB and adhered to when addressing allegations of sexual abuse of minors by Catholic clergy. Comprised of 18 Articles, it also includes guidelines for reconciliation, healing, accountability, and prevention/education to prevent future acts of abuse."[15]

198.    The Preamble to the *Charter* includes these statements:

Since 2002, the Church in the United States has experienced a crisis without precedent in our times. The sexual abuse of children and young people by some deacons, priests, and bishops, and the ways in which these crimes and sins were addressed, have caused enormous pain, anger, and confusion.

* * *

**We continue to have a special care for and a commitment to reaching out to the victims of sexual abuse and their families.** The damage caused by sexual abuse of minors is devastating and long-lasting. We apologize to them for the grave harm that has been inflicted on them, and we offer our help for the future.

(emphasis added)

199.    The first three Articles of the *Charter* appear under the heading: "To Promote Healing and Reconciliation with Victims/Survivors of Sexual Abuse of Minors."

---

[14] http://www.usccb.org/about/child-and-youth-protection/who-we-are.cfm (last visited January 31, 2019).

[15] *Diocese of Syracuse Child & Youth Protection / Safe Environment Annual Report*, April 2014 http://syracusediocese.org/assets/Uploads/pdfs/2014-10-year-report-FINAL-051414.pdf.    (last visited January 31, 2019).

200.    Article 1 of the *Charter* includes this language:

Dioceses/eparchies are to reach out to victims/survivors and their families and demonstrate a sincere commitment to their spiritual and emotional well-being. The first obligation of the Church with regard to the victims is for healing and reconciliation. Each diocese/eparchy is to continue its outreach to every person who has been the victim of sexual abuse as a minor by anyone in church service, whether the abuse was recent or occurred many years in the past.

201.    Article 2 of the *Charter* includes this language: "Dioceses/eparchies are to have a competent person or persons to coordinate assistance for the immediate pastoral care of persons who report having been sexually abused as minors by clergy or other church personnel."

202.    Articles 4 through 7 of the *Charter* appear under the heading: "To Guarantee an Effective Response to Allegations of Sexual Abuse of Minors."

203.    Article 4 of the *Charter* states:

Dioceses/eparchies are to report an allegation of sexual abuse of a person who is a minor to the public authorities. Dioceses/eparchies are to comply with all applicable civil laws with respect to the reporting of allegations of sexual abuse of minors to civil authorities and cooperate in their investigation in accord with the law of the jurisdiction in question.

Dioceses/eparchies are to cooperate with public authorities about reporting cases even when the person is no longer a minor.

In every instance, dioceses/eparchies are to advise victims of their right to make a report to public authorities and support this right.

204.    On June 17, 2005, the USCCB promulgated a revised version of the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons*, which were originally approved as particular law on November 13, 2002.

205.    The *Norms* became law for all Dioceses and Eparchies of the USCCB on May 15, 2006.

206.    *Norm* No. 3 states: "Each diocese/eparchy will designate a competent person to coordinate assistance for the immediate pastoral care of persons who claim to have been sexually abused when they were minors by priests or deacons."

207.    The USCCB drafted these documents to bind the Bishops and the Dioceses and require them to employ effective measures in handling reports of sexual abuse by Plaintiff and other sexual abuse survivors.

208.    The Charter and these Norms were created for the sole and immediate benefit of Plaintiff and other innocent victims who were subjected to sexual abuse by clergy.

209.    Pursuant to the express language, the intent behind the creation of these documents was for Plaintiff and all other victims—but the terms were not followed or upheld by the Institutional Defendants.

210.    Tragically, and to the immeasurable detriment of Plaintiff and hundreds of other victims, Institutional Defendants failed to uphold the unambiguous terms of the Charter, and these rampant failures to help and protect sexual abuse survivors continues today.

211.    It is time to hold the Catholic Church and Defendants accountable.

212.    Through this lawsuit, Plaintiff demands that the Diocese and all defendants acknowledge their failures, account for the damages these failures have caused, and institute real and meaningful change to ensure that no future children endure such abuse.

213.    The blind willfulness exhibited by the Diocese since at least 1980 is a despicable display of its lack of concern for sexual abuse survivors.

214.    Institutional Defendants' complete indifference and resulting inaction to sexual abuse allegations against Eckermann, Angelicchio and Quinn is wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and wellbeing.

## V.    CLASS ACTION ALLEGATIONS

215.    Plaintiff brings this action individually and pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), or (c)(4) on behalf of and the following Nationwide Classes:

### (b)(1) Limited Fund

Any person who (1) attended or served any parish within the Roman Catholic Diocese of Syracuse and was born after February 14, 1964, and (2) was subjected to sexual abuse, rape, molestation, or any sexual misconduct by (i) Charles Eckermann, (ii) Paul Angelicchio, (iii) James Quinn or (iv) any priest or clergyman who perpetuated or committed of any kind of sexual misconduct.

### (b)(2) Injunction Class

All former and current parishioners of any church within the Roman Catholic Diocese of Syracuse.

### (b)(3) or (c)(4) Damage Class

All those who (1) attended or served any parish within the Roman Catholic Diocese of Syracuse and were born after February 14, 1964, and (2) were subjected to sexual abuse, rape, molestation or any sexual misconduct by (i) Charles Eckermann, (ii) Paul Angelicchio, (iii) James Quinn or (iv) any priest or clergyman who perpetuated or committed of any kind of sexual misconduct.

216.    The Classes consist of hundreds, if not more, male and female victims residing throughout the U.S. and possibly abroad, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by the Diocese, St. Ann's, Bressette, and other churches and entities run or maintained by Institutional Defendants.

217.    The claims of Plaintiff are typical of the Classes. The claims of Plaintiff and the Classes are based on the same legal theories and arise from the same unlawful pattern and practice of sexual abuse or children; the promotion and cover-up of this misconduct; and the recklessness of Defendants engaging in this misconduct.

218.    There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

219.    Common questions of fact or common questions of law affecting members of the Classes include, but are not limited to, the following:

      a.   Whether each Defendant facilitated the sexual misconduct;

      b.   Whether each Defendant had active knowledge of the sexual misconduct;

      c.   Whether the Defendants intentionally relocated all known predatory priests to the Roman Catholic Diocese of Syracuse;

      d.   Whether the Defendants did actively hide from parishioners that the priests placed in Syracuse presented a real and credible threat of sexual misconduct to the young children within the parish;

      e.   Whether the Defendants took any action to ensure safeguards or measures protecting young children from the priests who were known child molesters;

      f.   Whether the Defendants actively engaged to protect the assets of Roman Catholic Church by lying to class members about their collective knowledge of child rapist priests;

      g.   Whether the Defendants engaged in a common scheme to misled parishioners on the source of funds for the legal defense of rapist priests; and

      h.   Whether the Defendants engaged in behavior to thwart reporting of child rapes by their priests to law enforcement

220.    Class certification under 23(b)(1)(B) is appropriate because the assets of the Diocese are likely insufficient to cover the exposure created by the rampant sexual abuse that

occurred within it over the past several years. The recent tactical bankruptcy filing of other dioceses throughout the country[16] is a signal that the Diocese of Syracuse will resort to whatever means it can to dodge the legal exposure. Even aside from the bankruptcy risk, the Diocese's assets are not significant enough to cover the exposure generated by the sexual abuse verdict(s) that will occur. This creates a classic "limited fund" situation that Rule 23(b)(1)(B) was drafted to solve. Thus, this case is properly certified as a limited fund class.

221.    As another alternative, if the Court is not inclined to certify the case as a limited fund class action, it should certify the class as a (b)(3) or (c)(4) damages class to adjudicate the common questions.

222.    Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to liability, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

223.    Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, and who have expertise in prosecuting personal injury, sexual abuse, and civil rights cases on behalf of vulnerable victims.

224.    Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and they have the financial resources and experience in handling sex abuse cases to do so.

---

[16] *Catholic diocese's bankruptcy filing sparks criticism about asset shifting*, CBS News (December 5, 2018) https://www.cbsnews.com/news/catholic-dioceses-bankruptcy-filing-sparks-criticism-about-asset-shifting

225.    Neither Plaintiff nor his counsel have any interests adverse to those of the other members of the Classes.

226.    Plaintiff and the Class will have personal injury damages that are individualized, but those can be managed separately.

## VI.    CAUSES OF ACTION

### Count I: Breach of Contract
### (Against Defendants The Roman Catholic Diocese of Syracuse and Robert J. Cunningham)

227.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

228.    A contract exists between Kevin and the Diocese (including through its head, Defendant Robert J. Cunningham) for the treatment of the complex post-traumatic stress disorder he suffers as a result of his abuse by priests and the ongoing trauma of his treatment by the Church.

229.    The above-named defendants entered into similar contracts with other victims of sexual abuse for the provision of psychotherapy/counselling.

230.    Kevin performed all of his duties under the contract, including complying provisions requiring him to disclose personal health information.

231.    On information and belief, other putative class members performed all of their duties under the contract.

232.    The Diocese and Cunningham breached the contract with Kevin in the following non-exclusive ways:

    a.    By denying Kevin full compensation for his treatment with a mental health professional;

    b.    By denying Kevin compensation for his other medical expenses; and

    c.    By denying Kevin treatment counseling and therapy beyond 53-minute sessions.

233.    Kevin was damaged emotionally and financially as a result of the breach of contract.

234.    The Diocese and Cunningham breached the contract with other putative class members in the following non-exclusive ways:

    a.    By denying full compensation for his treatment with therapists;

    b.    By denying compensation for other medical expenses; and

    c.    By denying therapy/counselling/treatment beyond 53-minute sessions.

235.    As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

236.    Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## Count II: Breach of Contract by Third Party Beneficiary
### (Against Defendants USCCB, Robert J. Cunningham, and the Roman Catholic Diocese of Syracuse)

237.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

238.    A contract exists between the United States Conference of Catholic Bishops and the Diocese of Syracuse in the forms of the *Charter* and the *Norms* to guide the handling and treatment of individuals who were abused by priests.

239.    Kevin and other class members are the third-party beneficiaries to this contract.

240.    Kevin reasonably relied on the representations made in the contract.

241.    The Diocese of Syracuse and Cunningham breached the contract in the following non-exclusive ways:

    a. By denying Kevin full compensation for his treatment with a mental health professional;

    b. By denying Kevin compensation for his other medical expenses; and

    c. By denying Kevin treatment counseling and therapy beyond 53-minute sessions.

    d. By not employing a competent person to serve as Victim Assistance Coordinator.

242.    The United States Conference of Catholic Bishops breached the contract in the following non-exclusive way: By failing to conduct adequate audits of the performance of the Diocese of Syracuse and Bishop Cunningham in the performance of its duties under the contract.

243.    As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

244.    Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### Count III: Intentional Infliction of Emotional Distress
### (Against Defendants The Roman Catholic Diocese of Syracuse, Robert J. Cunningham and Jacqueline Bressette)

245.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

246.    Defendants engaged in extreme and outrageous conduct with the intention of causing or with reckless disregard of the probability of causing Plaintiff severe and extreme emotional distress.

247.    Defendants treated other sexual abuse victims and members of the putative class in a similarly extreme and outrageous manner.

248.    Bressette and Cunningham were acting in the course and scope of their employment with the Diocese, while exhibiting reckless disregard for the emotional wellbeing of Kevin and other members of the putative class.

249.    Due to the outrageous conduct of Defendants, Kevin has suffered significant and enduring mental anguish and trauma.

250.    The damage caused will plague Kevin for the remainder of his life and will require him extensive mental health treatment.

251.    As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

252.    Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**Count IV: Breach of Fiduciary Duty**
**(Against Defendants The USCCB, The Roman Catholic Diocese of Syracuse, Robert J.**
**Cunningham, and Jacqueline M. Bressette)**

253.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

254.    Kevin reasonably relied on Defendants for guidance and confidence, as Defendants were in positions of power to exert influence and as such, a fiduciary relationship existed between Kevin and the Diocese of Syracuse, Cunningham, and Bressette.

255.    A fiduciary relationship existed between other members of the putative class and the USCCB, Diocese, Cunningham and Bressette.

256.    Defendants held themselves out as having a fiduciary responsibility and duty to Kevin, and accordingly and in reliance on this relationship, Kevin disclosed his history of abuse by Eckermann, Angelicchio and Quinn.

257.    Defendants breached their fiduciary duties to Kevin by intentionally, knowingly and/or recklessly failing to exercise the highest degree of care in handling the reports of abuse and in actively seeking to discredit Kevin's claims.

258.    Defendants breached their fiduciary duties to other members of the putative class.

259.    As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

260.    Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### Count V: Negligence
### (Against Defendants The USCCB, The Roman Catholic Diocese of Syracuse, Robert J. Cunningham, and Jacqueline M. Bressette)

261.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

262.    At all relevant times, Defendants had a duty to exercise reasonable care in relation to the safety and welfare of their young parishioners, including Plaintiff.

263.    At all relevant times, Defendants had a duty to exercise reasonable care to avoid creating or maintaining unreasonable risks to the safety and welfare of their young parishioners, including Plaintiff.

264.    At all relevant times, Defendants had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of law against their young parishioners, including Plaintiff.

265.    Defendants breached their duties by failing to take action or otherwise investigate the hundreds of complaints regarding sexual abuse at the hands of Eckermann, Angelicchio and Quinn, in reckless disregard of the safety and welfare of Plaintiff and other innocent children.

266.    Because of actions and inactions of Defendants, Plaintiff has suffered institutional abandonment and have experienced severe emotional distress.

267.    As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

268.    Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper

### Count VI: Gross Negligence
### (Against Defendants The Roman Catholic Diocese of Syracuse, Robert J. Cunningham, and Jacqueline M. Bressette)

269.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

270.    At all relevant times, Defendants had a duty to exercise reasonable care in relation to the safety and welfare of their young parishioners, including Plaintiff.

271.    At all relevant times, Defendants had a duty to exercise reasonable care to avoid creating or maintaining, unreasonable risks to the safety and welfare of their young parishioners, including Plaintiff.

272.    At all relevant times, Defendants had a duty to exercise reasonable care in investigating and pursuing complaints of criminal conduct, sexual misconduct, and violations of law against their young parishioners, including Plaintiff.

273.    Engaging in conduct that was wanton and willful, recklessly and in conscious disregard of the safety of innocent children parishioners, including Plaintiff, Defendants were grossly negligent in breaching these duties in one or more of the ways described throughout this complaint.

274.     These allegations against Defendants are based on misfeasance rather than simply failing to act. Time and again, Defendants affirmatively went out of their way to protect the priests (the rapists) and to actively discredit, intimidate, lie to, discredit, and attack Plaintiff and other class members (their victims).

275.     The allegations set forth above in the avalanche of media articles set forth in agonizing detail, the long-term, reckless decisions by Defendants to facilitate and foster sexual abuse and actively derail and discredit all attempts to protect the victims of sexual abuse.

276.     As a direct and proximate result of the grossly negligent conduct of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

277.     Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### Count VII: Assault
### (Against Defendants Estate of Charles Eckermann, Paul Angelicchio, Estate of James Quinn, John Doe Priests 4-200)

278.     Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

279.     Eckermann, Angelicchio, and Quinn each and all intentionally placed Kevin in apprehension of imminent harmful or offensive contact in a nauseating number of ways, which are discussed in detail and outlined above.

280.     Other members of the putative class were placed in apprehension of imminent harmful or offensive contact by Eckermann, Angelicchio, and Quinn, and/or the other as yet unknown pedophiles, currently known only as John Doe Priests 4-200.

281.   As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

282.   Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## Count VIII: Battery
### (Against Defendants Estate of Charles Eckermann, Paul Angelicchio, Estate of James Quinn, John Doe Priests 4-200)

283.   Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

284.   Eckermann, Angelicchio, and each and all intentionally raped Kevin.

285.   Eckermann, Angelicchio, and Quinn each and all intentionally committed other atrocious acts against and upon Kevin.

286.   Kevin did not, and could not, consent to this abhorrent and illegal contact.

287.   The other members of the putative class were raped, molested, or otherwise sexually and physically abused by Eckermann, Angelicchio, Quinn and/or the other as yet unknown pedophiles, currently known only as John Doe Priests 4-200.

288.   The other members of the putative class did not, and could not, consent to the abuse.

289.   Rape and the other abuse perpetuated are harmful and offensive bodily contacts.

290.   As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

291.   Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## Count IX: False Imprisonment
### (Against Defendants Estate of Charles Eckermann, Paul Angelicchio, Estate of James Quinn, John Doe Priests 4-200)

292.     Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

293.     Eckermann, Angelicchio, and each intentionally confined Kevin in various rooms (e.g., the sacristy, bathrooms, the basement furnace room, a rectory bedroom) to rape and abuse him.

294.     Kevin was conscious of the confinement and did not (and could not) consent to it.

295.     Kevin was confronted with threats of immediate physical harm if he attempted to escape the bounded areas where he was confined and abused.

296.     The confinement was not otherwise privileged.

297.     Other members of the putative class were similarly confined against their wills to be raped, molested, or otherwise sexually and physically abused by Eckermann, Angelicchio, Quinn, and/or the other as yet unknown pedophiles, currently known only as John Doe Priests 4-200.

298.     Other members of the putative class were conscious of their confinements and did not (and could not) consent to it.

299.     As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

300.     Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

**Count X: Civil Conspiracy**
**(Against The Roman Catholic Diocese of Syracuse, Defendants Estate of Charles Eckermann, Paul Angelicchio, Estate of James Quinn, John Doe Priests 4-200)**

301.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

302.    Eckermann, Angelicchio, Quinn, and John Doe Priests 4-200 had various agreements among various groups of themselves to select, groom, and sexually and emotionally abuse children from among their parishioners.

303.    Eckermann, Angelicchio, Quinn, and John Doe Priests 4-200 had various agreements among various groups of themselves to hide, conceal, or otherwise cover up their reprehensible conduct.

304.    When, as only one example, Eckermann and Angelicchio raped Kevin in the presence of one another, they demonstrated their intentional participation in the furtherance of the plan and/or purpose

305.    The Diocese ratified these agreements by acting in furtherance of the wrongful actions and allowing these clergy to conspire to engage in the conduct that resulted in sexual abuse of Kevin and other innocent victims.

306.    The Diocese conspired to allow these predatory priests to serve parishes and entitled them to unlimited access to children to fulfill their objectives.

307.    Kevin and the other members of the putative class were injured and damaged because of the agreements between and among the various pedophile priests and their intentional participation and acts in furtherance thereof.

308.    The Diocese, including through its head, Cunningham, had various agreements among various groups of themselves to shield or otherwise protect their pedophile priests from discovery or embarrassment.

309.    These defendants quietly relocated priests known to be sexually abusive to a house in Syracuse, New York.

310.    These defendants did not inform any of the public that pedophile priests were living in the Diocese in concentrated numbers.

311.    These defendants knew about the disgusting, damaging, and illegal sexual proclivities of Eckermann, Angelicchio, Quinn, and John Doe Priests 4-200 and did nothing to warn or otherwise protect Kevin or any other members of the putative class.

312.    Kevin was injured and damaged because of the agreements between and among the Diocese, including through its head, Cunningham.

313.    The other members of the putative class were injured and damaged because of the agreements between and among the Diocese, including through its head, Cunningham.

314.    As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

315.    Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

### Count XI: Fraud
**(Against Defendants The Roman Catholic Diocese of Syracuse, Robert J. Cunningham, and Jacqueline M. Bressette)**

316.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

317.    The Diocese, including through its head Cunningham, and through its employee/agent Bressette, represented to Kevin that he would be compensated for the therapy he required to treat the damage caused by their priests.

318.    The Diocese, including through its head Cunningham, and through its employee/agent Bressette, represented to other members of the putative class that they would be compensated for the therapy they required to treat the damage caused by the various priests.

319.    Defendants knew that they would strictly control the amount of therapy that would be compensated and that they would not fully compensate Kevin and/or his therapists for the treatment he needed.

320.    Defendants knew that they would strictly control the amount of therapy that would be compensated and that they would not fully compensate the other members of the putative class and/or their therapists for the treatment they needed.

321.    Defendants intended to induce Kevin to rely on their representations to gain access to his therapy records and/or for other "damage control."

322.    Defendants intended to induce the other members of the putative class to rely on their representations to gain access to their therapy records and/or for other "damage control."

323.    Kevin justifiably relied on the representations of these defendants.

324.    Other members of the putative class justifiably relied on the representations of these defendants.

325.    As a direct and proximate result of the negligent actions and inactions of Defendants, Plaintiff has suffered severe emotional distress, physical injuries, and economic losses, and these injuries continue.

326.    Plaintiff claims damages in amounts to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper

### Count XII: Defamation
### (Kevin Braney vs. The Roman Catholic Diocese of Syracuse and Robert J. Cunningham)

327.    Plaintiff incorporates the foregoing paragraphs as though fully reproduced herein.

328.    As detailed above, as an adolescent, Kevin was repeatedly raped by his priests.

329.    Kevin has been very public about the sexual abuse he endured in his youth in an effort to bring more attention to the problem.

330.    Kevin has been an outspoken critic of the Diocesan response to the allegations of sexual abuse against priests in and around the Syracuse area.

331.    The Diocese, including through its head Cunningham, instituted a smear campaign against Kevin and published statements calling into question his veracity and motives.

332.    Defendants' statements impugned Plaintiff's reputation, and tended to expose Plaintiff to public contempt, ridicule, aversion or disgrace, to induce an evil opinion of him in the minds of right-thinking persons, to cause them to be shunned or voided, and/or to injure them in occupation, good name, character, and reputation.

333.    As a direct and proximate result of the actions of Defendants and these statements, Plaintiff suffered damage by virtue of his loss of reputation, shame, mortification, hurt feelings, and/or damage to his property, business, trade, profession, and/or occupation.

334.    Plaintiff claims damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demand a jury trial in this matter.

## VIII.    PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court will:

A.    Enter judgment against Defendants, jointly and severally, in such amounts as will fully and adequately compensate Plaintiff for the damages suffered, in an amount to be determined at trial;

B.      Award Plaintiff punitive damages against Defendants, jointly and severally, in an amount to be determined at trial;

C.      Award Plaintiff pre- and post-judgment interest;

D.      Award Plaintiff his actual expenses of litigation, including reasonable attorneys' fees;

E.      Award Plaintiff injunctive relief that requires the Roman Catholic Diocese of Syracuse to put in place (and fund) supervision and compliance protocols that actually prevent, uncover, and stop the sexual abuse of parishioners;

F.      Appoint Plaintiff as class representative;

G.      Certify the classes described above;

H.      Appoint Plaintiff's counsel as counsel for the class; and

I.      Award Plaintiff such other and further relief as the Court deems just and proper.

Respectfully Submitted,


/s/ *Jessica Wegg*
Jessica Wegg, NDNY #519489
Jonathan Little (NY State Bar # 5499132)
*(application for admission forthcoming)*
Saeed and Little, LLP
133 W. Market Street #189
Indianapolis, Indiana 46204
(317) 721-9214
jessica@sllawfirm.com
jon@sllawfirm.com


Rex A. Sharp *(application for PHV forthcoming)*
Ryan C. Hudson *(application for PHV forthcoming)*
Larkin Walsh *(application for PHV forthcoming)*
Sarah T. Bradshaw *(application for PHV forthcoming)*
REX. A. SHARP, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
rsharp@midwest-law.com
rhudson@midwest-law.com
lwalsh@midwest-law.com
sbradshaw@midwest-law.com


Robert Allard *(application for PHV forthcoming)*
Lauren Cerri *(application for PHV forthcoming)*
CORSIGLIA, MCMAHON AND ALLARD, LLP
96 North Third Street, Suite 620
San Jose, CA 95112
(408) 289-1417
rallard@cmalaw.net
lcerri@cmalaw.net

**Attorneys for Plaintiff and Putative Class**